IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| V. | : | CRIMINAL NUMBER 25-185-1 |
| | : | |
| | : | |
| JILLIAN SANTIAGO-CRUZ | : | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Julian Santiago-Cruz, through counsel, submits this memorandum in aid of sentencing. He pled guilty pursuant to an open plea, accepts full responsibility for his actions, and respectfully requests that this Court consider all the mitigating factors explained in this memorandum and impose a sentence of time served with no supervised release to follow. This sentence would be sufficient but not greater than necessary to achieve the sentencing goals of 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005).

**I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

As discussed in further detail in the Presentence Report ("PSR") and the government's Change of Plea Memorandum, United States Immigration and Customs Enforcement ("ICE") learned of Mr. Santiago-Cruz's unlawful presence in the United States and arrested him on April 9. 2025. Mr. Santiago-Cruz had previously been deported from the United States in 2019, and did not have permission to reenter at the time of his arrest.

On April 30, 2025, a federal grand jury sitting in the Eastern District of Pennsylvania returned a one-count Indictment charging Mr. Santiago-Cruz with reentry after deportation, in violation of 8 U.S.C. § 1326(a). Mr. Santiago-Cruz appeared before the Honorable Karen Marston on July 17, 2025, and entered an open guilty plea to Count One of the Indictment.

## II.     MR. SANTIAGO-CRUZ'S PERSONAL HISTORY

On October 16, 1990, Mr. Santiago-Cruz (33) was born in Chiapas, Mexico to the marital union of Fidela Juarez (63) and Amador Gonzales (deceased). They lived together in a loving household along with his siblings, Adrian Santiago Cruz (43), Loudia Santiago Cruz (41), Aracelis Santiago Cruz (39), Guadalupe Santiago Cruz (38), and Sandra Santiago Cruz (36). Due to the unfortunate passing of his father at age 50, Mr. Santiago-Cruz stepped into the role of a leader and provider for his family. He attended school through the seventh grade in Chiapas, but as a result of his family's financial struggles, Mr. Santiago-Cruz left school to find employment and help provide for them. As hard as Mr. Santiago-Cruz would work to help his family gain financial stability in Chiapas—Mexico's poorest state—he nonetheless found himself and his family caught in the crossfire of a much bigger conflict. Beginning in 2015, Chiapas slowly grew into an open warzone between rival cartels, Mexican authorities, and the Guatemalan military. *See* Jorge Antonio Rocha, *Who's Behind the Rise in Violence in Chiapas, Mexico?*, AZTEC REPORTS (Aug. 14, 2023), https://www.aztecreports.com/whos-behind-the-rise-in-violence-in-chiapas-mexico/3855/.

As described in further detail below, cartels in Chiapas were the cause of widespread carnage, disappearances, coercion, and displacement. *Id.* Mr. Santiago-Cruz reported that cartel members would drive around Chiapas with loudspeakers, announcing that "all men must report to the park" under threat of violence. Once the civilians would appear as instructed, the cartel would use them as human shields to block the city from government officials and rival cartels. Further, many were forced to work for the cartel against their will. Mr. Santiago-Cruz was confronted with a difficult decision: either face the severe consequences of submitting to the cartel or leave his home and family behind.

Narrowly, Mr. Santiago-Cruz was able to escape. He begged his mother to leave as well, but she refused. Being the only male in the household, once Mr. Santiago-Cruz fled, nobody in his family

would be expected to participate in the "barricade" of innocent civilians. However, those in his family who remained are still expected to pay the cartel a tribute every 15 days. This, in addition to the role of provider that he took on as a 13-year-old boy, is why Mr. Santiago-Cruz has worked tirelessly in the United States; he sends approximately $300 to $400 home to his mother every month to ensure she is safe and stable. He is also the loving father of a four-year-old son, Giovani Santiago-Hernandez, who lives with his mother Guadalupe Hernandez-Dias (29) in Mexico. He sends them around $275 every month to support Giovani and is greatly looking forward to seeing him in person again.

In essence, everyone Mr. Santiago-Cruz knows and loves is in Mexico, and in his own words, "there is nothing left for me here in the United States." Although he has one brother, Adrian Santiago-Cruz, who lives in Delaware, all other members of his family are in Mexico, eagerly awaiting his return. Furthermore, Mr. Santiago-Cruz has a home to settle into and will find gainful employment in Mexico in construction. As he settles back into his life, and as circumstances permit, he would also like to return to school and complete his education.

### III.      APPLICATION OF THE SENTENCING GUIDELINES

Prior to imposing its sentence, the Sentencing Courts must: (1) properly calculate the guidelines range; (2) rule on any departure motion made under the guidelines; and (3) exercise discretion by choosing a sentence in full consideration of all relevant 18 U.S.C. § 3553(a) sentencing factors, "regardless [of] whether [the chosen sentence] varies from the sentence calculated under the guidelines." *United States v. Gunter*, 462 F. 3d 237, 247 (3d Cir. 2006). The Sentencing Guidelines are no more than "a starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586 (2007).

The PSR prepared by United States Probation Officer Tiyana Prince sets Mr. Santiago-Cruz's advisory guidelines range for imprisonment of zero to six months. The defense agrees with Officer Santella's calculation, based on a total offense level of six, a criminal history category of I.

IV.  **APPLICATION OF THE STATUTORY FACTORS TO THIS CASE**

In the present case, the Court must consider all of the factors identified in 18 U.S.C. § 3553(a) to craft a sentence that is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing. 18 U.S.C. § 3553(a)(1). Counsel submits that these factors weigh in favor of 18 months' imprisonment as follows in Mr. Santiago-Cruz's case:

   A.  **The Nature and Circumstances of the Offense and Mr. Santiago-Cruz's History and Characteristics**

Regarding the circumstances of the offense, Mr. Santiago-Cruz's reentry in December of 2024 directly coincides with the violence, coercion, and control of cartels in Chiapas. In the first seven months of 2024, 12,771 people were displaced in Chiapas as cartel gunmen forced residents to act as human blockades to stop rival crime groups and law enforcement from entering the area. Sam Woolston, *Warring Criminal Groups Are Targeting Civilians in Chiapas, Mexico*, INSIGHT CRIME (Aug. 27, 2024), https://insightcrime.org/news/warring-criminal-groups-are-targeting-civilians-in-chiapas-mexico/. In response, the Mexican government deployed 200 soldiers, but these efforts had little to no effect. *Id.* This mass exodus does not even properly account for the number of people who wish to flee—many were told that if they attempt to leave, they will be killed. *Id.* These were not idle threats. Between 2019 and 2023, the number of disappearances in Chiapas *tripled*. *Id.* In February 2024, human rights organizations confirmed that cartels are forcing civilians and skilled workers to commit acts of violence and support cartel day-to-day operations. *Id.* In the words of Carlos Juarez, Mexico Director at the Institute for Economics and Peace, "[w]hen criminal groups come to certain territories, the population does not even consider going to the authorities . . . *Their options for being safe don't include governments*." *Id.* (emphasis added). Between corruption and ineffective efforts to

4

quell cartel forces, law enforcement cannot be relied upon, and civilians must either cooperate with the cartel or take matters into their own hands. *Id.*

The violence so readily doled out by cartels in Chiapas has escalated to extreme levels, marked by brutal killings, mass graves, and assassinations of those who dare to speak out against them. *See* Vanessa Buschschlüter, *Mexican Priest Who Spoke out Against Cartel Violence Killed*, BBC News (Oct. 21, 2024), https://www.bbc.com/news/articles/cm292nvkvzmo (describing how the cartel in Chiapas murdered Mexican priest Father Marcelo Pérez in a drive-by shooting for his activism against the violence in Chiapas); *see also More than 30 Bodies Pulled from Hidden Graves in Mexico Region Plagued by Drug Cartel Turf War*, CBS News (last updated Dec. 31, 2024), https://www.cbsnews.com/news/hidden-graves-dozens-bodies-chiapas-mexico-cartel-turf-war/ (detailing the discovery of over 30 bodies dumped in secret graves in Chiapas); *see also* Bryan Avelar, *The Drug War Revives in Chiapas, and Clashes Cross the Border with Guatemala*, El Pais (June 9, 2025), https://elpais.com/america/2025-06-09/la-guerra-del-narco-revive-en-chiapas-y-los-enfrentamientos-atraviesan-la-frontera-con-guatemala.html (reporting that five state police officers were found burned to death by a cartel, which inspired Chiapas Governor Eduardo Ramírez to declare he would dispatch almost 1,000 police and army officers to the area);

Naturally, the escalating brutality and bloodshed that the people of Chiapas have faced has caused many to flee. *See* David Agren, *Mexicans Flee to Neighboring Guatemala to Avoid Being 'Human Shields,' Bishop Says*, Detroit Catholic (July 26, 2024), https://www.detroitcatholic.com/news/mexicans-flee-to-neighboring-guatemala-to-avoid-being-human-shields-bishop-says (describing how the violence, use of civilians as human shields, the lack of food, drug smuggling, human trafficking, illegal roadblocks, and forced recruitment has led to over 600 Mexican people fleeing to Guatemala); *see also* Thomas Graham, *More than 500 Mexicans Flee to Guatemala to Escape Cartel Violence in Chiapas*, The Guardian (July 30, 2024),

5

https://www.theguardian.com/world/article/2024/jul/30/mexico-chiapas-flee-to-guatemala (describing that hundreds of Mexicans have left their homes to go to Guatemala because Chiapas has become a warzone; "We're seeing confrontations with heavy weapons, armored vehicles and even armed drones. . . during these battles they've cut electricity and communications, and health services and education have been suspended").

Though the violence has not yet come to an end by any means, based on Mr. Santiago-Cruz's anecdotal evidence and renewed efforts by the Mexican and Guatemalan governments, there is newfound glimmer of hope that conditions in Chiapas start improving soon. *See* Héctor Ríos Morales, *Mexican Forces Kill Alleged Chiapas-Guatemala Cartel Leader 'Don Balde' in Cross-Border Operation*, LATIN TIMES (June 11, 2025), https://www.latintimes.com/mexican-forces-kill-alleged-chiapas-guatemala-cartel-leader-don-balde-cross-border-operation-584822 (describing how, following a two-hour shootout, Mexican authorities shot and killed one of the founding members of the regional cartel); *see also* Edgar H. Clemente, *Mexican Police in Chiapas Unveil Armed Drones to Combat Cartels*, AP NEWS (June 25, 2025), https://apnews.com/article/mexico-police-chiapas-cartels-drones-border-a834e98af1edde5e6848c7cfb1295423 (explaining that due to being "frequently outgunned by cartels with heavy guns and increasingly with drones that dropped improvised explosive devices," Chiapas police are countering with a fleet of their own armed drones); *see also* Carola Guerrero De León, *Guatemala Deploys Troops to Mexican Border as Cartel Violence in the Region Escalates*, THE LATIN TIMES (last updated June 28, 2025), https://www.latintimes.com/guatemala-deploys-troops-mexican-border-cartel-violence-region-escalates-577878 (stating that the violence has escalated to the point where the President of Guatemala, Bernardo Arévalo, is deploying the military and overseeing operations via air, land, and sea to improve security for communities along the border).

It was under these brutal circumstances that Mr. Santiago-Cruz decided to return to the United States. Even so, he realizes that he can never return here again. Even if conditions in Chiapas remain the same or worsen, Mr. Santiago-Cruz has acknowledged that if he must flee again, he has to find refuge elsewhere until conditions improve in Chiapas. Putting aside the fact that spending time in federal custody is a serious punishment in and of itself, he knows that if he is in United States custody, he is unable to work and send money home to his mother and son. Without financial aid, his mother could face violent consequences from the cartel. Although, upon information and belief, she is currently staying afloat because she was able to save up some of the money that Mr. Santiago-Cruz sent her, he knows that her savings will eventually run out. He would not risk putting his mother in harm's way by returning to the United States.

Regarding the nature of the offense, the crime of illegal reentry after deportation is serious, however, it is a non-violent offense without identifiable victims. He has spent almost four months at the Federal Detention Center in Philadelphia without incident, accruing no disciplinary infractions. Before his current incarceration, Mr. Santiago-Cruz was working diligently in construction, exerting himself every day to earn a living for himself and the family that relies on him. In regard to the offense itself, one's motives for committing this crime are often deeply intertwined with complicated social, economic, and political considerations—all of which are present in this case.

> **B.** **The Need for the Sentence Imposed to Promote Certain Statutory Objectives**
>
> > *1.    To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.*

Mr. Santiago-Cruz has now spent a not-insignificant amount of time in a federal correctional facility. He recognizes that the loss of his liberty and the stress of these proceedings have taken a large toll on his family and relationships. Mr. Santiago-Cruz also recognizes that these are all consequences of his own actions. He does not seek to justify or minimize his actions—merely to provide important context behind his actions. The Court, however, should recognize that he made a

poor decision to commit a serious crime and one that he will pay dearly for. Consequently, a sentence of time served, which equates to the middle of the advisory guidelines range, would fairly include this sentencing objective.

### 2. To afford adequate deterrence to criminal conduct.

Understandably, both the government and this Court are concerned about deterring Mr. Santiago-Cruz from ever returning to the United States without permission in the future. The defense submits that any sentence, even one at the low end of the advisory guideline range, will deter Mr. Santiago-Cruz from returning to the United States.

Mr. Santiago-Cruz's prosecution and conviction for this case in the serious venue of federal court, along with the risk of serving a prison term that could be imposed, provides a more-than-adequate general deterrent to other, similarly situated individuals. Moreover, it is well-established that the *certainty* of punishment, not the *severity* of it, has the most significant general deterrent effect. *See*, *e.g.*, CESARE BECCARIA, ON CRIMES AND PUNISHMENTS AND OTHER WRITINGS 63 (Richard Bellamy, ed.; Richard Davis, trans., Cambridge University Press 1995) (1764); Frank H. Easterbrook, *Criminal Procedure as a Market System*, 12 LEGAL STUD. 289, 295 & n.7 (1983); Alfred Blumstein, *Prison*, *in* CRIME 387, 408-409 (Wilson & Petersilia, eds., 1995); Daniel S. Nagin & Greg Pogarsky, *Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence*, 39 CRIMINOLOGY 865 (2001); Josiah Tonry, *The Functions of Sentencing and Sentencing Reform*, 58 STAN. L. REV. 37, 52-54 (2005); Raymond Paternoster, *How Much do we Really Know about Criminal Deterrence*, 100 J. CRIM. L. & CRIMINOLOGY 765, 818 (2010) ("The safest conclusion from the literature thus far would be that the perception of certain legal and extralegal sanctions does seem to act as a modest deterrence factor, but that the perceived severity and celerity of punishment do not appear to be effective deterrents to crime, and we know virtually nothing about celerity"). Therefore, a sentence in the middle of the advisory Guidelines

range would doubtlessly send an appropriate message to others and deter people from committing similar crimes.

Additionally, should Mr. Santiago-Cruz reenter the United States in the future, he would face another prosecution for violating 8 U.S.C. § 1326 and he would be facing a greater guideline range. The instant conviction gives him two criminal history points, and depending on the outcome of his open charge in Montgomery County, he could have an increase in his criminal history category from I to III. The prospect of a higher sentencing guideline range should he reenter, will provide additional deterrence for Mr. Santiago-Cruz to ever attempt to reenter the United States. Mr. Santiago-Cruz will never put myself or his family through this situation again.

> 3. *To protect the public from further crimes of the defendant.*

Mr. Santiago-Cruz does not pose a risk to the public. Although Mr. Santiago-Cruz's history includes one conviction of driving while under the influence in 2019 and a 17-year-old conviction of failure to stop after accident, he has never harmed anyone; these were the results of youthful recklessness that he has since learned from. In fact, as noted in the PSR, Mr. Santiago-Cruz has not had any record of disciplinary infractions or misconduct while incarcerated. PSR ¶ 10. He is a peaceful, hard-working, family-oriented man that wishes to serve his sentence without incident, return home to his family, and do his best to improve their circumstances. He was also not taking advantage of the taxpayer by receiving any federal or state benefits—he worked honest jobs and paid his own way.

Furthermore, the Court need not be reminded of the costs of incarcerating an individual in the Bureau of Prisons. As indicated in PSR ¶ 61, each additional month that Mr. Santiago-Cruz remains in custody prior to his inevitable deportation will cost the United States taxpayers approximately $4,309. A sentence of time served would meet all the statutory factors set forth by Congress and keep the financial burdens of incarcerating him to a minimum.

> 4. *To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.*

There are no educational or vocational considerations for this Court when fashioning an appropriate sentence as it is highly unlikely that Mr. Santiago-Cruz would be afforded vocational or educational opportunities due to his status as a deportable alien. The presence of an immigration detainer will limit access to programs available to similarly situated United States citizens. 28 C.F.R. § 544.51(b) ("Generally, inmates under orders of deportation, exclusion, or removal may participate in an institution's occupational education program if Bureau resources permit after meeting the needs of other eligible inmates"); 28 C.F.R. § 544.41(a)(3). In essence, Mr. Santiago-Cruz will only be permitted to participate in educational and occupational programs after all eligible United States citizen inmates are enrolled.

  **C.** **Kinds of Sentences Available and The Need to Provide Restitution**

The range of sentences statutorily available to the Court are listed in Part D of the PSR. Supervised release is not mandated in this case, though the Court may impose a term of not more than three years. Further, the maximum fine for this offense is $250,000, with a mandatory special assessment of $100.00. Restitution is not applicable in this case.

**V.** **CONCLUSION**

**WHEREFORE**, for the above reasons and any other reasons deemed just, the defense prays that the Court will grant the defendant's request to impose a sentence of term of time served.

              Respectfully submitted,

              */s/ Zachary Parrish*
              ZACHARY PARRISH
              Assistant Federal Defender

**CERTIFICATE OF SERVICE**

      I, Zachary Parrish, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I filed the attached Defendant's Sentencing Memorandum via the Court's Electronic Filing (ECF) system, which sent notification to Mary E. Crawley, Assistant United States Attorney, Suite 1250, 615 Chestnut Street, Philadelphia, Pennsylvania 19106, via her email address Mary.Crawley2@usdoj.gov.


                                             */s/ Zachary Parrish*
                                             ZACHARY PARRISH
                                             Assistant Federal Defender


DATE:  July 25, 2025